# 05 CV 5443

# # 1

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

SECURITIES AND EXCHANGE COMMISSION,

              **Plaintiff,**

             v.

TAKE-TWO INTERACTIVE SOFTWARE, INC.,
RYAN BRANT, LARRY MULLER, JAMES
DAVID, JR., and ROBERT BLAU,

             **Defendants.**

          **CIVIL ACTION**
          **NO. _____**

---

## COMPLAINT

    Plaintiff Securities and Exchange Commission ("Commission") alleges that:

## SUMMARY

    1.    Take-Two Interactive Software, Inc. ("Take-Two" or "the Company") is a New York-based publisher and distributor of video and computer games. During its 2000 and 2001 fiscal years, Take-Two inflated its revenues through fraudulent sales and improper accounting practices. Such practices included numerous "parking" transactions where the Company shipped several hundred thousand video games to different distributors, fraudulently recorded revenue from the shipments as if they were sales, and then accepted returns of the shipments in subsequent reporting periods. Some of the returns associated with this practice were not accounted for by the Company as returns in the later reporting period (*i.e.,* they were not netted against sales). Instead, these returns were disguised as the purchase of new inventory. During this period, Take-Two also recognized sales of games for which production had not yet

been completed.  Take-Two used these artifices to materially inflate its reported revenues and profits and to meet analysts' earnings per share predictions.

2.      Ryan Brant, Take-Two's former Chairman and Chief Executive Officer, Larry Muller, former Executive Vice President and Chief Operating Officer, James David, Jr., former Chief Financial Officer and Robert Blau, current Vice President of Sales, knew or should have known of the Company's efforts to fraudulently inflate its revenues.

3.      In addition to the improper sales practices described above, Take-Two took certain accounting positions that violated Generally Accepted Accounting Principles ("GAAP").  For example, in 2000, Take-Two's earnings were inflated by the improper recording of the acquisitions of two video game publishers.  The improper accounting for these acquisitions resulted in an overstatement of earnings by approximately $20 million.

4.      From its fiscal year 2000 through the end of the third quarter of fiscal year 2003, Take-Two also consistently violated GAAP by failing to set aside adequate reserves to account for future price concessions that the Company granted its customers.

5.      On December 14, 2001, after press accounts appeared regarding concern that the Company would have to restate its earnings for fiscal year 2001, the price of Take-Two shares declined 31 percent on trading volume of 20.3 million shares, more than ten times the average trading volume for Take-Two shares during the previous three months.

6.      In February 2002, Take-Two restated its financial statements for its fiscal year ended October 31, 2000 and the first three quarters of its fiscal year 2001 to correct for the parking transactions during the period that the Company had used to inflate its revenues.  The Company's February 2002 restatement also corrected for its improper accounting for the acquisition of two video game publishers in 2000.

7.    In February 2004, Take-Two again restated its financial statements.  In its 2004 restatement, Take-Two corrected for its failure to set aside reserves for future price concessions during fiscal year 2000 through the end of the third quarter of fiscal year 2003.  The Company's February 2004 restatement also corrected for the improper accounting treatment of approximately 88 additional sales transactions during 2000 and 2001 that had inflated its revenues.

8.    Take-Two's fraudulent parking transactions and recording sales of games for which production had not yet been completed, its improper accounting for acquisitions, and its improper failure to set aside adequate reserves associated with future price concessions materially overstated its reported revenue and/or earnings for nine of the fifteen quarters between 2000 and the third quarter of 2003.  Its parking transactions allowed Take-Two to consistently meet or exceed analysts' predictions regarding its earnings per share during all four quarters of fiscal year 2000.  The parking transactions also allowed the company to meet certain financial targets which triggered the payment of substantial bonuses to Brant, Muller and David.

9.    Unless restrained and enjoined by this Court, Defendants Brant, Muller and David will continue to engage in the transactions, acts, practices, and courses of business described herein, and in transactions, acts, practices, and courses of business of a similar type and object.

## JURISDICTION

10.    The Securities and Exchange Commission brings this action pursuant to Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)] to

permanently enjoin Defendants Take-Two, Brant, Muller and David from future violations of the federal securities laws and to obtain other relief.

    11.    This Court has jurisdiction over this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa]. Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

    12.    Defendants, directly or indirectly, made use of the means or instrumentalities of interstate commerce or of the mails, or the facilities of a national securities exchange in connection with the acts, transactions, practices or courses of business alleged herein.

## THE DEFENDANTS

    13.    Take-Two is a Delaware corporation headquartered in New York, New York. The Company develops, markets and publishes interactive entertainment software games for video game consoles and personal computers. Take-Two is a leading publisher of video game software in the United States. Take-Two also distributes games published by other companies, and operates in Canada, Europe, and other foreign locations. Take-Two's common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act [15 U.S.C. § 78(g)] and is currently listed on NASDAQ under the symbol "TTWO." The Company operates on an October 31 fiscal year. For its fiscal year ended October 31, 2003, Take-Two reported over $1 billion in revenue.

    14.    Ryan Brant, age 33, is a resident of Bedford Corners, New York. He has been with Take-Two since 1993. Brant was Chairman and Chief Executive Officer of Take-Two until February 2001, when he resigned from his position as Chief Executive Officer. He

resigned from the Chairmanship in March 2004. He currently holds the title "Publishing Director – 2K Games."

15.    Larry Muller, age 47, is a resident of Melville, New York. Muller was Take-Two's Chief Financial Officer from January 1999 to April 2000, Chief Operating Officer from April 2000 to February 2001, Executive Vice President from February 2001 to October 2001 and Vice President of Operations from October 2001 to early 2002, when he resigned from the Company.

16.    James David, Jr., age 40, is a resident of Bethpage, New York. He replaced Muller as Take-Two's Chief Financial Officer in July 2000, and remained in that position until December 2001. David remained with Take-Two as the head of the Credit and Collection department until he resigned from the Company in February 2002.

17.    Robert Blau, age 50, is a resident of Long Beach, New York. He has been Vice President of Sales at Take Two since July 1998.

## FACTS

### Take-Two Engaged In Improper Sales Practices

#### *Take-Two Engaged in Parking Transactions with Capitol Distributing*

18.    From October 31, 2000 through July 31, 2001, Take-Two knowingly or recklessly engaged in several fraudulent sales transactions with Virginia-based distributor Capitol Distributing ("Capitol") totaling approximately $15 million.

19.    Take-Two used Capitol to park large quantities of video games, all of which the Company either took back as returns, or purported to "repurchase" from a fictitious Capitol affiliate using invoices and purchase orders falsely describing the returned games as

"assorted product." Even though these shipments were not, in fact, sales, Take-Two improperly recorded approximately $15 million in revenue associated with its parking shipments to Capitol.

20.     On October 31, 2000, Take-Two's fiscal year-end, Take-Two shipped 230,000 video games to Capitol with the understanding that the shipment would be returned. Take-Two improperly recorded $5.4 million as revenue from the shipment – which at that time was Take-Two's largest sale ever. In subsequent reporting periods, Capitol returned the entire shipment. At Muller's direction, Blau set up the October 31, 2000 Capitol transaction and approved the return of the games. In an effort to hide the return, Muller directed Blau and Blau agreed to arrange for the return to be made through an affiliate of Capitol and to disguise the return as a purchase of "assorted product" from that Capitol affiliate with an invoice that made no reference to specific titles or descriptions of the product. Muller made or directed others to make false and misleading purchase orders and invoices in connection with this transaction and the other parking transactions described below in paragraphs 21 through 47 in order to conceal from the Company's auditor the facts that shipments fraudulently recorded as sales in one reporting period were being returned in a subsequent reporting period and that those returns were being fraudulently treated as purchases of new inventory. As a result, Muller made materially false or misleading statements to Take-Two's auditor during its audit of the Company's financial statements. Muller's employment contract explicitly made his quarterly bonus contingent on Take-Two increasing its net income in each period – which the parking transactions did.

21.     On February 28, 2001, Take-Two shipped approximately 175,000 video games to Capitol and improperly recorded $4.6 million in revenue from the "sale." The entire shipment of what at the time was Take-Two's second largest sale ever was subsequently returned. Again, in an effort to conceal the fact that the original shipment had not been an actual

sale, the Company arranged for the return to be made through the Capitol affiliate and disguised the return as a purchase of "assorted product" with an invoice that made no reference to specific titles or descriptions.

22.     On April 27, 2001, near the end of Take-Two's second fiscal quarter, the Company shipped approximately 55,000 video games to Capitol and recorded $1.76 million as revenue from the "sale." After the end of the second quarter, Take-Two took back the entire shipment as a return.

23.     On July 31, 2001, the end of Take-Two's third quarter, the Company shipped over 85,000 video games to Capitol and recorded approximately $3 million from the "sale." After the end of that quarter, Take-Two took back the entire shipment as a return.

24.     In total, between its fiscal year ended 2000 and third quarter 2001, Take-Two shipped well over 500,000 video games with Capitol and booked nearly $15 million of associated revenue for transactions that were not actual sales, but were, in fact, simple parking transactions.

25.     As the Company's CFO during the conduct at issue, David was ultimately responsible for the manner in which Take-Two recorded its sales transactions. David knew about the fraudulent sales and parking transactions during 2000 and 2001 -- including the disguising of returns as purchases of new inventory, and the impact of those transactions on Take-Two's reported financials. When David signed Take-Two's Form 10-K for fiscal-year 2000, he knew, or was reckless in not knowing, that the Company improperly recognized $5.4 million in revenue from its largest transaction, the October 31, 2000 shipment to Capitol. When David signed Take-Two's Form 10-Q filed on April 30, 2001, he knew that the filing included a financial statement that improperly recognized $4.6 million from the February 2001 Capitol

shipment. David's employment contract explicitly made his quarterly bonus contingent on Take-Two increasing its net income in each period – which the parking transactions did.

26.     On December 13, 2000, David signed a management representation letter to Take-Two's auditor in connection with the audit of the Company's consolidated financial statements as of October 31, 2000 certifying that, among other things, there was "no fraud involving management or employees who have significant roles in the Company's internal control" during the three-year period ended October 31, 2000. On January 29, 2001, David reaffirmed that representation by signing another management representation letter. David knew, or was reckless in not knowing, of the Company's continuing fraud when he signed both letters, directly making false or misleading statement's to the Company's auditor during its audit of the Company's financial statements.

27.     Brant was aware that Take-Two was making certain shipments to Capitol and he knew that some games from those shipments were being returned. He also discussed with Muller and David treating some of those returns as purchases of new inventory. Consequently, Brant knew, or was reckless in not knowing, that Take-Two's reported financial results in 2000 and 2001 were materially inflated by the transactions with Capitol. Before Brant signed Take-Two's Form 10-K for fiscal-year 2000, he knew, or was reckless in not knowing, that the Company was improperly recognizing revenue from the transactions with Capitol. Brant's substantial bonuses were dependent on Take-Two meeting First Call's consensus estimate of the Company's earnings per share in each quarter. As discussed below, the parking transactions allowed Take-Two to meet or exceed those earnings estimates throughout fiscal year 2000. Brant likewise knew, or was reckless in not knowing, that the Company's April 30, 2001 Form

10-Q filing included a financial statement that was false and misleading as a result of the parking transactions.

### Take-Two Engaged in Parking Transactions with Corner Distributors

28.    In 2000 through July 31, 2001, Take-Two knowingly or recklessly engaged in similar fraudulent parking transactions with New York City-based Corner Distributors ("Corner") from which Take-Two improperly recorded more than $10 million in revenue. Take-Two's transactions with Corner included the purported sale and subsequent repurchase shortly thereafter of all, or substantially all, of the video games it sold with no legitimate business purpose for the paired transactions. For example, on October 31, 2000, Take-Two shipped 27,000 video games to Corner and recorded $995,220 of revenue from the shipment for its fiscal year 2000. Take-Two then repurchased those games from Corner during the second quarter of fiscal year 2001 and concealed the fact that the Company was taking back large quantities of returns by falsely describing the games as "assorted product" on purchase orders.

29.    Muller directed Blau and Blau agreed to arrange the parking transactions with Corner. Blau knew that Muller's purpose for the parking transactions with Corner was to improperly inflate Take-Two's reported financial results.

30.    On January 29, 2001, near the end of Take-Two's first quarter, it shipped 24,000 games to Corner; recorded the transaction as a "sale;" and booked $972,000 as revenue from the shipment for the first quarter of fiscal year 2001. Take-Two then repurchased the entire shipment from Corner during the second quarter of fiscal year 2001.

31.    On April 26, 2001, near the end of Take-Two's second quarter, it shipped approximately 40,000 video games to Corner, treating the shipment as a sale at a price of nearly

$1.5 million.  Take-Two booked the $1.5 million as revenue for the second quarter.  Less than one month later, but in the next quarter, Take-Two took back the entire shipment as a return.

32.     On July 30, 2001, near the end of Take-Two's third quarter, it invoiced and shipped approximately 40,000 video games to Corner at a price of nearly $1.5 million.  After recording the transaction as a "sale" and booking the nearly $1.5 million as revenue for the third quarter, Take-Two took back the entire shipment as a return in the fourth quarter.

33.     On at least seven other occasions, Take-Two repeated this pattern of invoicing and shipping video games to Corner, recording the transaction as a "sale," booking the revenue and, in subsequent reporting periods, taking the product back as returns or repurchases.

### Take-Two Engaged in Parking Transactions with SJS Group LTD

34.     In 2000 through July 31, 2001, Take-Two engaged in fraudulent sales transactions with Canadian distributor SJS Group LTD ("SJS," currently HIP Interactive), totaling more than $7 million.  For example, on October 31, 2000, Take-Two purported to "sell" to SJS approximately 50,000 video games for a total price of $1.7 million, which Take-Two recorded as revenue for its fiscal year 2000.  By March 2001, Take-Two had accepted return of virtually all of the 50,000 games from SJS.

35.     Muller directed Blau and Blau agreed to arrange the parking transactions with SJS.  Blau knew that Muller's purpose for the parking transactions with SJS was to improperly inflate Take-Two's reported financial results.

36.     On January 29, 2001, Take-Two purported to "sell" 30,000 video games to SJS at a price of $1.2 million, which Take-Two recorded as revenue in its first quarter.  In April 2001, during its second quarter, Take-Two accepted return of all 30,000 games from SJS.

-10-

37.     On at least eight other occasions, Take-Two repeated this pattern of invoicing and shipping video games to SJS, recording the transaction as a "sale," booking the revenue and, in subsequent reporting periods, taking back the product as returns.

*Take-Two Engaged in Parking Transactions with About Time, Inc.*

38.     In 2000 through July 31, 2001, Take-Two engaged in fraudulent transactions with Texas-based distributor About Time, Inc. ("About Time") totaling nearly $7 million. For example, on October 31, 2000, Take-Two invoiced and shipped over 100,000 video games to About Time at a price of approximately $1 million. After recording the transaction as a "sale" and booking the approximately $1 million as revenue for its fiscal year 2000, Take-Two repurchased the entire shipment of games in December 2000 and January 2001, falsely describing the games as "assorted product" on purchase orders to disguise the nature of the transaction.

39.     Muller directed Blau and Blau agreed to arrange the parking transactions with About Time. Blau knew that Muller's purpose for the parking transactions with About Time was to improperly inflate Take-Two's reported financial results.

40.     On January 24, 2001, Take-Two invoiced and shipped over 140,000 games to About Time at a price of approximately $900,000. After recording the transaction as a "sale" and booking the approximately $900,000 as revenue for the first quarter, Take-Two repurchased the entire shipment of video games from About Time during the second quarter, falsely describing the games as "assorted product" on purchase orders to disguise the nature of the transaction.

41.     On February 27, 2001, Take-Two invoiced and shipped approximately 150,000 video games to About Time at a price of $1.25 million. In May 2001, after recording

the transaction as a "sale" and booking the $1.25 million as revenue for the second quarter, Take-Two repurchased the entire shipment of video games from About Time during the third quarter and falsely described the games as "assorted product" on purchase orders to disguise the nature of the transaction.

42.     On at least six other occasions, Take-Two repeated this pattern of invoicing and shipping video games to About Time, recording the transaction as a "sale," booking the revenue and, in subsequent reporting periods, taking the product back as returns or repurchases.

### Take-Two Engaged in Parking Transactions with Pioneer Distributors

43.     In 2000 through July 31, 2001, Take-Two engaged in fraudulent transactions with California-based Pioneer Distributors ("Pioneer") totaling over $5 million.  For example, on January 17, 2001, Take-Two invoiced and shipped approximately 145,000 video games to Pioneer at a price of approximately $930,000.  After recording the transaction as a "sale" and booking the approximately $930,000 as revenue for the first quarter, Take-Two repurchased the entire shipment of video games from Pioneer in subsequent reporting periods.

44.     Muller directed Blau and Blau agreed to arrange the parking transactions with Pioneer.  Blau knew that Muller's purpose for the parking transactions with Pioneer was to improperly inflate Take-Two's reported financial results.

45.     On July 26, 2001, Take-Two invoiced and shipped approximately 124,000 units of video games to Pioneer at a price of approximately $765,000.  After recording the transaction as a "sale" and booking the approximately $765,000 as revenue for the third quarter, Take-Two repurchased the entire shipment of video games from Pioneer during the next quarter.

46.     Four days later, on July 30, 2001, Take-Two engaged in a similar improper transaction with Pioneer - this time invoicing and shipping 14,400 video games to Pioneer at a price of approximately $530,000.  After again recording the transaction as a "sale" and booking the approximately $530,000 as revenue for the third quarter, Take-Two took back the complete shipment of games as a return during the fourth quarter.

47.     On at least eleven other occasions, Take-Two repeated this pattern of invoicing and shipping video games to Pioneer, recording the transaction as a "sale," booking the revenue and, in subsequent reporting periods, taking the product back as returns or repurchases.

*Take-Two's Parking Transactions Violated GAAP*

48.     Take-Two's accounting for the parking transactions described above in Paragraphs 18 through 47 was in direct violation of Statement of Financial Accounting Standard 48 ("FAS 48").  FAS 48 Paragraph 6.b, permits recognition of revenue at the time of sale only if the buyer assumes the obligation to pay the seller for the goods invoiced or shipped.  In the Take-Two parking transactions, however, both Take-Two and the distributors understood that the distributors assumed no obligation to pay for the goods, but were instead free to return or resell them to Take-Two without restriction or penalty.  Thus, by booking revenue at the time of these purported "sales," Take-Two knowingly or recklessly violated FAS 48 and GAAP.

*Take-Two Improperly Recorded Sales of Games that were Still in Production*

49.     In several transactions between 2000 and 2001, Take-Two fraudulently recorded as "sales" and booked revenue from transactions involving games for which production had not yet been completed.

50.     In the first of these transactions, in July 2000, Muller directed New York City-based Big Apple Distributors ("Big Apple") to submit a purchase order for 130,000 video

games at a price of $2.3 million.  Take-Two recorded the transaction as a "sale" and booked the

$2.3 million as revenue although the production of the games had not yet been completed.

      51.    In the second transaction, in October 2000, Muller directed Big Apple to

submit a purchase order for 60,000 video games at a price of $1.1 million.  Take-Two

improperly booked the $1.1 million as revenue from a "sale" of games for which production had

not yet been completed.

      52.    On October 31, 2000 (the last day of Take-Two's fiscal quarter), Muller

arranged various sales of a video game entitled "Sheep" for which production had not yet been

completed.  Take-Two improperly booked revenue from those sales in that quarter, even though

the games were not shipped to customers until the first quarter of fiscal year 2001.  Muller

instructed at least one Company employee to keep these transactions confidential.

*Take-Two's Improper Sales Practices Allowed it to Meet Analysts' Expectations*

      53.    The parking transactions allowed Take-Two to consistently meet or

exceed analysts' predictions regarding its earnings per share during all four quarters of fiscal

year 2000.

      54.    For the quarter ending January 31, 2000, First Call's consensus estimate

for Take-Two's earnings was 18 cents per share.  Take-Two reported earning 20 cents per share

for the period.  If its parking transactions had been properly recorded, it would have reported

earnings of 16 cents per share – missing analysts' expectations by two cents per share or 11

percent.

      55.    For the quarter ending April 30, 2000, First Call's consensus estimate for

Take-Two's earnings was 12 cents per share.  Take-Two reported earning 13 cents per share for

the period. If its parking transactions had been properly recorded, it would have reported a loss of 33 cents per share – missing analysts' expectations by 45 cents per share.

56.   For the quarter ending July 31, 2000, First Call's consensus estimate for Take-Two's earnings was 11 cents per share. Take-Two reported earning 12 cents per share for the period. If its parking transactions had been properly recorded, it would have reported earnings of 8 cents per share – missing analysts' expectations by three cents per share or 27 percent.

57.   For the quarter ending October 31, 2000, First Call's consensus estimate for Take-Two's earnings was 41 cents per share. Take-Two reported earning 42 cents per share for the period. If its parking transactions had been properly recorded, it would have reported earnings of 27 cents per share – missing analysts' expectations by 14 cents per share or 34 percent.

58.   For fiscal year 2000, First Call's consensus estimate for Take-Two's earnings was 88 cents per share. Take-Two reported earning 88 cents per share for the period. If its parking transactions had been properly recorded, it would have reported earnings of 16 cents per share – missing analysts' expectations by 72 cents per share or 82 percent.

<u>Take-Two's Other Violations of GAAP</u>

59.   In addition to the intentional improper sales practices described above, Take-Two took certain accounting positions that violated GAAP.

*Take-Two Improperly Accounted For Acquisitions*

60.   In or about October 2000, Take-Two inflated its earnings by improperly recording the acquisition of video game developer Gameplay, Inc. ("Gameplay"). In that transaction, Take-Two sold to Gameplay both a subsidiary and the online distribution rights to

certain Take-Two personal computer games in exchange for approximately 15 million shares of Gameplay stock and other assets. But Take-Two accounted for its sale of the online distribution rights as if it were a separate transaction, not part of the consideration for the Gameplay shares and assets. As a result, Take-Two improperly recognized $2.6 million of revenue.

61.    In February 1999, Take-Two acquired a 20% interest in video game developer Gathering of Developers ("Gathering"). After this acquisition, Take-Two was required to use the "equity" method to account for its interest in Gathering – the equity method of accounting is required whenever a company acquires a 20% to 50% interest in another company. Emerging Interests Task Force Issue No. 99-10, "Percentage Used to Determine the Amount of Equity Method Losses" ("EITF 99-10") required Take-Two to recognize 100% of Gathering's losses from February 1999 through April 2000 because Take-Two provided Gathering with 100% of its funding during that period. Gathering lost $19.2 million during that period, but Take-Two failed to recognize the loss. Take-Two's failure to recognize Gathering's loss violated GAAP and resulted in a $19.2 million overstatement of the Company's pre-tax earnings during its fiscal year 2000.

### Take-Two Failed to Reserve for Future Price Protection

62.    Take-Two generally sells its games to retailers and distributors at certain prices. Often, to allow those retailers and distributors to discount the price to the retail consumers, Take-Two will agree to rebate a portion of the original sales price. That arrangement is known as "price protection." During Take-Two's fiscal year 2000 through the third quarter of 2003, the Company granted price protection for most of its shipments of its proprietary games.

63.    AICPA Statement of Position 97-2, "Software Revenue Recognition" ("SOP 97-2") addresses the proper accounting for sales transactions when a seller transacts with

a "reseller" (e.g., a distributor) and grants the reseller price protection. Failure to follow the guidance in SOP 97-2 is a violation of GAAP. SOP 97-2 states that the seller may only immediately recognize revenue from the transaction if the seller can reasonably estimate the future price discounts and sets aside reserves for those discounts at the time the revenue is recognized. If the seller does not make a reasonable estimate of the future price discounts and does not set aside the appropriate reserves, then it must defer revenue recognition from the transaction. During its fiscal year 2000 through its third quarter of 2003, Take-Two fully recognized revenue for transactions while failing to set aside at the time of the transactions any associated reserves for price protection – a violation of GAAP that resulted in inflated revenues and assets.

<u>Take-Two Filed Several False Financial Statements</u>

64.    As a result of the conduct described in paragraphs 18 through 63 above, Take-Two made material misstatements or omissions in the following annual and quarterly reports filed with the Commission:

(a) January 31, 2000 Form 10-Q: Net income overstated by $820,000 or 17%;

(b) April 30, 2000 Form 10-Q: Net income reported as $3.4 million, a $12 million overstatement;

(c) July 31, 2000 Form 10-Q: Net income overstated by $1 million or 36%;

(d) October 31, 2000 Form 10-K: Net income overstated by $5 million or 35% for fourth quarter; $20 million or 82% for fiscal year 2000;

(e) April 30, 2001 Form 10-Q: Net sales overstated by $4.7 million or 5%;

(f) July 31, 2001 Form 10-Q: Net income overstated by $280,000 or 69%;

(g) October 31, 2001 Form 10-K: Gross profit for fourth quarter overstated by $7.6 million or 21%;

(h) April 30, 2002 Form 10-Q: Net income overstated by $1.6 million or 17%; and

(i) July 31, 2003 Form 10-Q: Net income overstated by $2 million or 26%.

<u>The Company's First Restatement</u>

65.     In February 2002, Take-Two restated approximately 90 sales transactions totaling nearly $50 million that occurred during its fiscal years 2000 and 2001.  Certain of these transactions involved "parking," the practice whereby certain distributors accepted Take-Two's merchandise at or near the end of its fiscal quarters or fiscal year end either with no intention to sell it, or with the understanding that any unsold product could be returned to Take-Two at any time.  Take-Two knew, or was reckless in not knowing, that these sales transactions and the Company's accounting treatment of the transactions were improper.  In this restatement, Take-Two also acknowledged that its accounting treatment of past acquisitions (described in Paragraphs 60 through 61 above) had violated GAAP and reduced its earnings for fiscal year 2000 by approximately $20 million.

<u>The Company's Second Restatement</u>

66.     In February 2004, Take-Two restated to correct for its improper accounting treatment of approximately 88 additional sales transactions that had inflated its revenues by over $11 million at or near the end of quarters or fiscal years 2000 and 2001.

67.    Also in February 2004, Take-Two restated its financial results for 2000 through and including the third quarter of fiscal year 2003 to correct its failure to set aside adequate reserves for future price concessions granted to customers.

### Take-Two's Internal Controls Were Deficient

68.    From fiscal year 2000 through and including the third quarter of 2003, Take-Two failed to devise and maintain a system of internal controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit the preparation of its financial statements.  The Company's failure to make and keep books, records, and accounts that accurately and fairly reflected the Company's transactions and disposition of the Company's assets contributed to Take-Two's failure to file accurate financial statements with the Commission as required by law.

## LEGAL CLAIMS

## FIRST CLAIM

(Violations of the Section 17(a) Antifraud Provisions
of the Securities Act, 15 U.S.C. § 77q(a))
(Take-Two, Muller and David)

69.    The Commission re-alleges and incorporates by reference the allegations contained in Paragraphs 18 through 47 above.

70.    Defendants Take-Two, Muller and David directly or indirectly, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails has employed devices, schemes or artifices to defraud; have obtained money or property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or have engaged in

transactions, practices or courses of business which operated or would operate as a fraud or deceit upon purchasers.

   71. By reason of the foregoing, Defendants Take-Two, Muller and David violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SECOND CLAIM

(Violations of the Section 10(b) Antifraud Provisions
of the Exchange Act, 15 U.S.C. § 78j(b),
and Rule 10b-5 Thereunder, 17 C.F.R. § 240.10b-5)
(Take-Two, Muller and David)

   72. The Commission re-alleges and incorporates by reference the allegations contained in Paragraphs 18 through 47 above.

   73. Defendants Take-Two, Muller and David directly or indirectly, by the use of the means and instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange in connection with the purchase or sale of securities have employed devices, schemes or artifices to defraud; have made untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or have engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon any person.

   74. By reason of the foregoing, Defendants Take-Two, Muller and David violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## THIRD CLAIM

(Aiding and Abetting Violations of the Section 10(b) Antifraud Provisions
of the Exchange Act and Rule 10b-5 Thereunder)
(Brant)

75.    The Commission re-alleges and incorporates by reference the allegations

contained in Paragraphs 18 through 47 above.

76.    Section 20(e) of the Exchange Act, U.S.C. § 78t(e), provides that any

person that knowingly provides substantial assistance to another person in violation of a

provision of the Exchange Act, or of any rule or regulation issued under the Exchange Act, shall

be deemed to be in violation of such provision to the same extent as the person to whom such

assistance is provided.

77.    By reason of the conduct described above, Defendant Brant knowingly

provided substantial assistance to Defendant Take-Two in its violations of Section 10(b) of the

Exchange Act and Rule 10b-5 thereunder.

## FOURTH CLAIM

(Violations of the Section 13(a) Financial Reporting Provisions
of the Exchange Act, 15 U.S.C. § 78m(a),
and Rules 12b-20,13a-1 and 13a-13 Thereunder,
17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13)
(Take-Two)

78.    The Commission re-alleges and incorporates by reference the allegations

contained in Paragraphs 18 through 68 above.

79.    Defendant Take-Two filed materially false and misleading annual reports

on Forms 10-K with the Commission for the fiscal years ending October 31, 2000 and October

31, 2001.

80.    Defendant Take-Two filed materially false and misleading quarterly reports on Forms 10-Q with the Commission for the quarters ending January 31, 2000; April 30, 2000; July 31, 2000; April 30, 2001; July 31, 2001; April 30, 2002 and July 31, 2003.

81.    By reason of the foregoing, Defendant Take-Two violated Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13.

## FIFTH CLAIM

(Aiding and Abetting Violations of the Section 13(a) Financial
Reporting Provisions of the Exchange Act
and Rules 12b-20, 13a-1 and 13a-13 Thereunder)
(Brant, Muller and David)

82.    The Commission re-alleges and incorporates by reference the allegations contained in Paragraphs 18 through 68 above.

83.    By reason of the conduct described above, Defendants Brant, Muller and David knowingly provided substantial assistance to Defendant Take-Two in its violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder.

## SIXTH CLAIM

(Violations of the Sections 13(b)(2)(A) and 13(b)(2)(B) Books and Records
and Internal Controls Provisions of the Exchange Act,
15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B))
(Take-Two)

84.    The Commission re-alleges and incorporates by reference the allegations contained in Paragraphs 18 through 68 above.

85.    Defendant Take-Two failed to make and keep books, records and accounts which accurately and fairly reflected its transactions and disposition of its assets.

86.     Defendant Take-Two failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that its corporate transactions were executed in accordance with management's authorization and in a manner to permit the preparation of financial statements in conformity with GAAP.

87.     By reason of the foregoing, Defendant Take-Two violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B).

## SEVENTH CLAIM

(Aiding and Abetting Violations of the Sections 13(b)(2)(A) and
13(b)(2)(B) Books and Records and
Internal Controls Provisions of the Exchange Act)
(Brant, Muller and David)

88.     The Commission re-alleges and incorporates by reference the allegations contained in Paragraphs 18 through 68 above.

89.     By reason of the conduct described above, Defendants Brant, Muller and David knowingly provided substantial assistance to Defendant Take-Two in its violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.

## EIGHTH CLAIM

(Violations of Section 13(b)(5) of the Exchange Act,
15 U.S.C. § 78m(b)(5))
(Muller, David and Blau)

90.     The Commission re-alleges and incorporates by reference the allegations contained in Paragraphs 18 through 68 above.

91.     Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), makes it unlawful to knowingly circumvent or knowingly fail to implement a system of internal accounting controls, or to knowingly falsify any book, record, or account.

92.     By reason of the conduct described above, Defendants Muller, David and Blau knowingly circumvented or knowingly failed to implement a system of internal accounting controls, or knowingly falsified Defendant Take-Two's books, records, or accounts, and therefore violated Section 13(b)(5) of the Exchange Act.

### NINTH CLAIM

(Violations of Rule 13b2-1 of the Exchange Act,
17 C.F.R. § 240.13b2-1)
(Take-Two, Brant, Muller and David)

93.     The Commission re-alleges and incorporates by reference the allegations contained in Paragraphs 18 through 68 above.

94.     Rule 13b2-1 of the Exchange Act, 17 C.F.R. § 240.13b2-1, makes it unlawful for a person to, directly or indirectly, falsify or cause to be falsified any book, record, or account subject to Section 13(b)(2)(A) of the Exchange Act.

95.     By reason of the conduct described above, Defendants Take-Two, Brant, Muller and David directly or indirectly falsified or caused to be falsified books, records or accounts subject to Section 13(b)(2)(A) of the Exchange Act, and therefore violated Rule 13b2-1 of the Exchange Act.

### TENTH CLAIM

(Violations of Rule 13b2-2 of the Exchange Act,
17 C.F.R. § 240.13b2-2)
(Muller and David)

96.     The Commission re-alleges and incorporates by reference the allegations contained in Paragraphs 18 through 68 above.

97.     Rule 13b2-2 of the Exchange Act, 17 C.F.R. § 240.13b2-2, makes it unlawful for an officer or director of an issuer to, directly or indirectly:  (1) make or cause to be

made a materially false or misleading statement to an accountant in connection with any audit, review or examination of financial statements, or the preparation or filing of any document or report required to be filed with the Commission; or (2) omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading to an accountant in connection with (1) above.

98.    By reason of the conduct described above, Defendants Muller and David made or caused to be made materially misleading statements to accountants and/or omitted to state material facts necessary to make statements made to accountants not misleading, and therefore violated Rule 13b2-2 of the Exchange Act.

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that this Court:

### I.

### Permanent Injunctive Relief
(Take-Two, Brant, Muller and David)

A.    Enter an Order permanently enjoining Defendants Take-Two, Muller and David from violating Section 17(a) of the Securities Act.

B.    Enter an Order permanently enjoining Defendants Take-Two, Brant, Muller and David from violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

C.    Enter an Order permanently enjoining Defendant Take-Two from violating Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder.

-25-

D.    Enter an Order permanently enjoining Defendants Brant, Muller and David from aiding and abetting violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder.

E.    Enter an Order permanently enjoining Defendants Muller and David from violating Section 13(b)(5) of the Exchange Act.

F.    Enter an Order permanently enjoining Defendants Take-Two, Brant, Muller and David from violating Rule 13b2-1 of the Exchange Act.

G.    Enter an Order permanently enjoining Defendants Muller and David from violating Rule 13b2-2 of the Exchange Act.

## II.

### Officer and Director Bar
(Muller, David and Brant)

A.    Enter an Order barring Defendant Muller from serving as an officer or director of any public company pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

B.    Enter an Order barring Defendant David for a period of ten (10) years from serving as an officer or director of any public company pursuant to Section 20(e) of the Securities Act and Section 21(d) of the Exchange Act.

C.    Enter an Order barring Defendant Brant for a period of five (5) years from serving as an officer or director of any public company pursuant to Section 21(d) of the Exchange Act.

### III.

#### Disgorgement
(All Defendants)

A.      Enter an Order directing Defendants Take-Two, Brant, Muller, David and Blau to pay disgorgement of all ill-gotten gains, plus prejudgment interest thereon.

### IV.

#### Civil Money Penalties
(All Defendants)

A.      Enter an Order directing Defendants Take-Two, Muller, David and Blau to pay civil penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d) and Section 21(d) of the Exchange Act and directing Defendant Brant to pay a civil penalty pursuant to Section 21(d) of the Exchange Act.

B.      Enter an Order establishing a Fair Fund for the benefit of innocent investors pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002.

### V.

#### Further Relief
(All Defendants)

Grant all such further legal or equitable relief as the Court deems appropriate.

## VI.

### Retention of Jurisdiction
(All Defendants)

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may herein be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Dated:   June ___, 2005
         Washington, DC


Robert B. Blackburn (RB 1545)
Local Counsel for Plaintiff

SECURITIES AND EXCHANGE
   COMMISSION
3 World Financial Center, Room 4300
New York, NY 10281-1022
E-Mail: BlackburnR@SEC.GOV
Phone: (212) 336-1050
Fax:     (212) 336-1317


Of Counsel:
Paul R. Berger, Esq.
Mark Kreitman, Esq.
J. David Fielder, Esq.
David B. Witherspoon, Esq.

Respectfully submitted,


Michael K. Lowman (ML 8983)
Assistant Chief Litigation Counsel
Attorney for Plaintiff

SECURITIES AND EXCHANGE
   COMMISSION
100 F Street, N.E.
Mail Stop 4631
Washington, DC 20549
E-Mail: LowmanM@SEC.GOV
Phone: (202) 551-4477
Fax:     (202) 772-9245